Filed 11/24/20  P. v. Watkins CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ANDREW JOHN WATKINS, <br><br> Defendant and Appellant. | F080318 <br><br> (Super. Ct. No. CRF55727) <br><br><br> **OPINION** |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Tuolumne County.  James A. Boscoe, Judge.

Kaiya R. Pirolo, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]      Before Franson, Acting P.J., Smith, J. and Meehan, J.

Defendant Andrew John Watkins was convicted by court trial of vandalism causing over $400 in damage and several other offenses. On appeal, he contends the evidence was insufficient for the trial court to have found that the value of the property he damaged met or exceeded $400 in value. We affirm.

## PROCEDURAL SUMMARY

On June 5, 2018,[1] the Tuolumne County District Attorney charged defendant with vandalism causing more than $400 in damage (Pen. Code, § 594, subd. (a));[2] count 1), misdemeanor domestic battery (§ 243, subd. (e)(1); count 2), misdemeanor child abuse (§ 273a, subd. (b); count 3), and misdemeanor battery (§ 242; count 4). As to count 1, the information alleged defendant had served two prior prison terms (§ 667.5, subd. (b)).

On August 28, 2019, defendant waived his right to a jury trial. The court trial began on the same day and, on August 29, 2019, the trial court found defendant guilty on all counts and found true both of the prior prison term allegations.[3]

On November 8, 2019, the trial court sentenced defendant to a split sentence of one year in county jail and two years on mandatory supervision as follows: on count 1, the upper term of three years, with one year to be served in jail and the two remaining years to be served on mandatory supervision; on count 2, one year, to run concurrently to

---

[1] All further dates refer to the year 2018 unless otherwise stated.

[2] All further statutory references are to the Penal Code.

[3] At sentencing, the trial court dismissed both prior prison term enhancement allegations in anticipation of the amendments to section 667.5 effected by Senate Bill No. 136 (2019–2020 Reg. Sess.). !(RT 371, 391)! The abstract of judgment erroneously reflects that the trial court imposed a one-year prior prison term enhancement. We will direct the trial court to correct that clerical error by striking the section 667.5, subdivision (b) enhancement. (*People v. Jones* (2012) 54 Cal.4th 1, 89 ["When an abstract of judgment does not reflect the actual sentence imposed in the trial judge's verbal pronouncement, [the] court has the inherent power to correct such clerical error on appeal, whether on [its] own motion or upon application of the parties."].)

the sentence on count 1; on both counts 3 and 4, six months, to run concurrently to the sentence on count 1.

On November 13, 2019, defendant filed a notice of appeal.

## FACTUAL SUMMARY

*The Prosecution's Case*

*Beth's Account*[4]

Beth Allen Ingram-Vercher had five children. Defendant was the father of two of those children. Defendant also had a three-year-old daughter, Allison, of whom Beth was not the mother.

On December 24, 2017, Beth, her boyfriend Joshua Watkins,[5] her five children, and defendant's daughter Allison, went Christmas shopping then returned to Beth's home to bake cookies and wrap presents. Beth asked defendant if Allison could stay with her for Christmas because she had purchased presents for Allison to open on Christmas morning and defendant was not prepared for the holiday. Defendant initially agreed but then came to Beth's house later in the day. Beth noticed that when defendant arrived, he was shaking, talking to himself, and pacing before he came inside and sat on the couch in the living room.

Beth and Joshua left the living room to wrap presents. About 10 minutes later, Beth's 12-year-old daughter told her that defendant was asking one of Beth's other children for money. Beth was upset so she returned to the living room and asked defendant if he had asked her child for money. Defendant became upset, stood up, said that Beth's daughter was lying, and called for Allison to pack her things because they were leaving. Beth asked defendant to calm down several times and pleaded with him to

---

[4]    Because many of the people mentioned at trial share last names, we refer to them by their first names for clarity and brevity. No disrespect is intended.

[5]    Joshua Watkins was also defendant's half brother.

let her keep Allison for the night. During the same conversation, defendant asked Beth for money and she refused.

When Beth refused defendant's request for money, he became more upset, went to the bedroom Allison was in, and hit the door until it opened.[6] Defendant then told Allison to pack her things and yelled at Beth's children to find Allison's shoes. Joshua came to the bedroom and asked defendant to calm down and stop yelling. While defendant was holding Allison, he hit Joshua. Joshua then left the room to find his telephone and call 911. Beth yelled at defendant to leave her house as he made his way to the living room. Defendant then threw Allison to the ground, screamed in Beth's face, picked up a tool bag, and hit Beth's leg with it. Beth fell to the ground. When she got back up, defendant grabbed her by the head and threw her to the ground.

Defendant then turned his attention to Beth's property. He threw her television off the stand, knocked down the decorated Christmas tree, stepped on the presents, and threw a lamp. The television and lamp were destroyed, three gifts were damaged or destroyed, and the tree and decorations were damaged. Beth had paid about $400 for the television, she and Joshua had paid about $400 for the gifts, and she estimated that the lamp and tree were each worth about $50.

While defendant was attacking Beth or damaging items in her living room, she sent all six children to the back porch because she was concerned for their safety and did not want them to see defendant being violent. After defendant damaged the items in the living room, Beth's oldest son, Orion, then came back into the house and told defendant

---

[6]     The door and frame were undamaged before defendant hit them but were both damaged after. The maintenance company that Beth consulted told her that it would cost approximately $225 to fix the damage to the door. A photograph depicting the damage to the door and frame was admitted into evidence.

to leave.  When defendant did not leave, Orion let their dog out of his kennel to scare defendant into leaving.[7]  Defendant then left Beth's house and she called 911.

### Orion's Account

Orion was in his bedroom in his mother's house on December 24, 2017, when he heard a commotion in the living room.  He ran to the living room and saw defendant in the middle of the room, Beth standing near him, Joshua standing near the entry, and his siblings on the couch on the opposite side of the room from the adults.  His grandmother, Reba Ingram, and Allison were also in the house.  Joshua and Andrew were making the most noise.  Joshua was telling defendant to calm down.  Within about 45 seconds, defendant grabbed Beth by her neck.  Joshua then separated defendant from Beth and threw defendant toward their new television and Christmas tree.  The television and Christmas tree were either damaged while defendant was grabbing Beth by her neck or when Joshua separated defendant from Beth and pushed him toward the tree and television.  Joshua then pursued defendant toward the Christmas tree and they both stepped on the gifts and ornaments.  Orion then let his dog out of the kennel to try to scare defendant away.  Defendant ran to the porch, grabbed Allison, and ran away.

### Reba's Account

Reba was at her daughter Beth's house on December 24, 2017, making cookies with some of Beth's children while Beth and Joshua shopped for Christmas presents.  While Beth and Joshua were gone, defendant walked into the house without knocking and was visibly upset.  He did not have gas for his car and wanted gas money.

When Beth and Joshua returned home, Joshua took the gifts to the bedroom and Beth stayed in the living room to talk to defendant.  Defendant then asked Beth for gas money.  She refused because she had given him gas money the day before.  Defendant

---

**7**    At some point during the altercation, Orion also held a frying pan as he stood in the living room.  Joshua took the frying pan from Orion.

called Beth names and began to yell at her. Joshua heard the shouting, came to the living room, and asked defendant to leave. Defendant then punched Joshua in the face. Joshua said, " 'I don't want to fight you,' " and then defendant called Joshua names and punched him again. The two men then began to wrestle as Joshua attempted to force defendant out of the house. At some point the men separated and defendant removed the television from the stand and threw it into a glass table between him and Joshua. Defendant then threw the Christmas tree.

Beth then tried to stop the fight between defendant and Joshua. When she did so, defendant picked her up by her neck, threw her on the ground, picked up a heavy tool bag, and threw it on top of her. At that point, Orion came to the living room, grabbed a frying pan, advanced on defendant, and told him to leave.

Soon after, the dog barked at defendant, defendant picked up Allison, exited the house to the second story balcony, made his way over the balcony, and left.

### The Defense's Case

Defendant testified that he asked Beth if Allison could stay at her house and Beth agreed. Allison's stay with Beth began on December 23, 2017. Defendant came to Beth's house the next day to pick Allison up. He was upset because Beth was not at home when he arrived to pick Allison up so her things were not packed. Defendant decided to wait at Beth's home for her to return.

When Beth returned home, she greeted the children, and went to her bedroom. Defendant sat in the living room with his children. His children began fighting and defendant asked them to settle down. Beth then came from her bedroom and told defendant that he was not allowed to tell his children to settle down. That upset defendant and he responded by calling Beth "a choice name." He then carried Allison to a bedroom to pack her things. He pushed the partially ajar door to the bedroom open with his foot because he had Allison in his arms. He did not kick, slam, or damage the door. Joshua and Beth followed defendant to the bedroom and stood in the doorway.

6.

Joshua said, " 'I don't know what your F'ing problem is, but you need to leave.' " Defendant responded that he was "trying to leave."

Defendant testified that his "instincts" told him that he "had to fight [his] way out of that room" because Joshua "was in [his] face yelling, … angry, … [and] ready to fight." He put Allison down and punched Joshua. Beth then took Allison and told one of the other children to take her outside. Defendant and Joshua continued fighting. Defendant backed away from Joshua into the living room as Joshua pursued. Once in the living room, defendant attempted to go through the sliding glass door to the balcony, but Beth blocked his path with her arms outstretched. Defendant attempted to force his way past her when she grabbed him. Defendant then pushed Beth and she fell to the ground. He turned around and Joshua grabbed him by the throat and pushed him into the Christmas tree. At that point, Joshua must have forced defendant into the television, lamp, and gifts. Defendant did not purposefully damage any of those items.

Joshua then released defendant and backed away. As defendant attempted to exit the house, the dog moved toward him and barked. Defendant hit the dog and left the house through the back door to the balcony. He then picked up Allison and Joshua attempted to hit him again. Defendant eventually escaped over the balcony with Allison.

At no point that day did defendant ask anyone at the house for money.

## DISCUSSION

Defendant contends that the evidence was insufficient to establish that the value of the property he destroyed met or exceeded $400. We disagree. The verdict on count 1 was supported by sufficient evidence.

The trial court explained how it reached its verdict. As to count 1, the court found that defendant "willful[ly] and malicious[ly] damage[d]" the television and the lamp. However, the court found that there was no substantial evidence to show that defendant willfully and maliciously damaged the other items. The court explained that it relied upon Beth's testimony regarding the television and lamp to conclude that defendant

7.

caused damage in excess of $400. Accordingly, we consider only whether there was sufficient evidence to conclude the damage to the television and lamp met or exceeded $400.

"In reviewing a challenge to the sufficiency of the evidence under the due process clause of the Fourteenth Amendment to the United States Constitution and/or the due process clause of article I, section 15 of the California Constitution, we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Cole* (2004) 33 Cal.4th 1158, 1212; accord, *People v. Albillar* (2010) 51 Cal.4th 47, 59–60.) "We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar*, *supra*, at p. 60.) It is well settled that " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the … verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

Vandalism is punishable as a felony or a misdemeanor, depending on the amount of damage to the property. "If the amount of defacement, damage, or destruction is four hundred dollars ($400) or more," the vandalism is a felony. (§ 594, subd. (b)(1).) "If the amount of defacement, damage, or destruction is less than four hundred dollars ($400)," the vandalism is a misdemeanor. (§ 594, subd. (b)(2)(A).) Section 594 "does not itself specify a method for proving the amount of property damage in a vandalism prosecution …." (*In re Kyle T.* (2017) 9 Cal.App.5th 707, 713.)

Defendant contends that the appropriate measure of the value of the damaged property for purposes of section 594 is the fair market value of the property and not an

estimated purchase price. For that proposition, defendant relies on authority relating to the valuation of stolen property for purposes of the theft offenses which differentiate felony from misdemeanor based on the value of the property stolen. (*People v. Renfro* (1967) 250 Cal.App.2d 921, 924; e.g., § 487.) The People contend that "[i]t is unnecessary to adopt such an approach because the testimony of one with adequate qualifications to estimate—and not guess—the actual amount of damages incurred … is enough." We conclude that fair market value is not an appropriate method of calculation of damage or destruction of property for the purposes of section 594.

We are unconvinced by defendant's contention that because this incident of vandalism, like theft, resulted in deprivation of property we must apply the same method of calculation of property value as if defendant were convicted of a theft offense. As a preliminary matter, the theft statutes expressly require a valuation of the property stolen (§ 487 [a theft is grand theft when "property taken is a value exceeding" $950]) and the value be measured by fair market value (§ 484 ["In determining the value of the property obtained, for the purposes of this section, the reasonable and fair market value shall be the test."]). Section 594 does not require a valuation or mandate use of fair market value. It instead focuses on the amount of defacement, damage, or destruction. Courts have calculated the amount of defacement, damage, or destruction as the actual or estimated cost of repair (*In re A.W.* (2019) 39 Cal.App.5th 941, 950; *In re Kyle T.*, *supra*, 9 Cal.App.5th at pp. 713–714; *People v. Carrasco* (2012) 209 Cal.App.4th 715, 718), the purchase price of the property (*In re Arthur V.* (2008) 166 Cal.App.4th 61, 65 [finding $350 of damage for rendering inoperable a cellular phone that "cost $350"]), and the replacement cost of the property (*A.W.*, *supra*, at p. 950; see *People v. LaDuke* (2018) 30 Cal.App.5th 95, 98). Conversely, no published opinion has extended the fair market value method of calculating the value of stolen property to the measurement of the amount of defacement, damage, or destruction for purposes of section 594. We will not do so either.

9.

Here, Beth testified she paid about $400 for the television, and it was undamaged before defendant threw it on the ground and "destroyed it." Reba and Orion both testified that the television was "brand-new," recently bought, and had no prior damage. Beth also testified the lamp was worth "[a]bout $50" and was broken when defendant threw it. A photograph of the damaged television and a photograph of the damaged lamp were admitted into evidence. From that evidence, the trial court could reasonably have concluded beyond a reasonable doubt that the amount of damage or destruction to the television and lamp, as measured by the estimated purchase price or replacement cost, exceeded $400. The verdict was supported by sufficient evidence.

## **DISPOSITION**

The judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment, correcting the clerical error by striking the section 667.5, subdivision (b) enhancement. The court shall forward a copy of the amended abstract of judgment to the appropriate entities.